In re the TERMINATION OF PARENTAL RIGHTS TO
VAUGHN R., a person under the age of 18:

MONROE COUNTY DEPARTMENT OF HUMAN SERVICES,
Petitioner-Respondent,

v.

LUIS R., Respondent-Appellant.

Court of Appeals

*No. 2009AP627. Submitted on briefs May 13, 2009.
—Decided June 29, 2009.*

2009 WI App 109

(Also reported in 770 N.W.2d 795.)

652

654

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Devon M. Lee, Assistant State Public Defender*, Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Kerry Sullivan-Flock, Monroe County Corporation Counsel.*

Before Higginbotham, P.J., Dykman and Vergeront, JJ.

¶ 1. VERGERONT, J. This appeal of an order terminating Luis R.'s parental rights to Vaughn R. presents three issues involving the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 (2006):[1] (1) Does § 1912(f) of the ICWA, which requires a showing of likely serious emotional or physical damage to the child from continued custody by the parent, apply where the child is placed outside the parental home at the time the termination of parental rights (TPR) proceeding is initiated? (2) Does the record support a determination that the social worker testifying for the County is a "qualified expert witness" within the meaning of § 1912(f)? (3) Does § 1912(d), which requires efforts to provide remedial and rehabilitative services to prevent the breakup of the Indian family, impose a burden of proof beyond a reasonable doubt in a TPR proceeding?

¶ 2. We conclude that 25 U.S.C. § 1912(f) applies even though the child has been placed outside the parental home before the TPR proceeding is filed. Thus, in this case it applies even though Vaughn has been living with foster parents for several years. Because § 1912(f) applies, the County was required to prove beyond a reasonable doubt, by evidence that includes testimony of "qualified expert witnesses," that returning Vaughn to Luis "is likely to result in serious emotional or physical damage" to Vaughn. We conclude the

---

[1] All references to the United States Code are to the 2006 version unless otherwise noted.

record does not provide a reasonable basis for deciding that the county social worker is a "qualified expert witness" within the meaning of § 1912(f). Accordingly, we reverse and remand for a new trial.

¶ 3. Because the correct burden of proof for the showing required by 25 U.S.C. § 1912(d) will arise on remand, we address the issue. We conclude that, unlike § 1912(f), § 1912(d) does not impose a burden of proof on the states, and, in particular, does not require proof beyond a reasonable doubt for the § 1912(d) showing relating to efforts by the County to provide the prescribed services. Therefore, the instruction to the jury that this showing has to be proved by clear and convincing evidence is a proper statement of the law.

## BACKGROUND

¶ 4. At the time of Vaughn's birth on October 18, 2004, his mother and his father, Luis, were in a relationship but were not living together. Vaughn was removed from his parents' care in February 2005 on an emergency basis due to injuries that, it was suspected, were caused by physical abuse. The Monroe County Department of Human Services placed Vaughn with foster parents with whom he has lived ever since, with the exception of a six-month period in 2005 when he was placed back in his mother's home. Luis was charged with physical abuse of a child contrary to Wis. Stat. § 948.03(2)(a) (2007–08),[2] but was acquitted in October 2007. Vaughn is a special needs child with a severe permanent brain injury that has caused a seizure disorder, significant developmental delays, and legal blindness.

---

[2] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

¶ 5. In May 2008, the County filed a petition for involuntary termination of Luis's parental rights.[3] The petition alleged that Vaughn had been adjudicated a child in need of protection and services (CHIPS), had consistently remained placed outside his father's home under a dispositional order since May 2005, and that all the requirements for termination of parental rights under Wis. Stat. § 48.415(2) were met.[4] Luis denied the allegations of the petition and requested a jury trial.

¶ 6. At the trial Vaughn's treating neurologist testified to his medical conditions and needs and his foster mother testified to the extensive care he required. A social worker employed by the County testified to the conditions imposed under various court

---

[3] At that time, Vaughn's mother indicated to the department that she wished to terminate her parental rights. However, she had not done so by the time of the disposition hearing in this case.

[4] WISCONSIN STAT. § 48.415(2) provides:

> (2) Continuing need of protection or services. Continuing need of protection or services, which shall be established by proving . . .:

> (a) 1. That the child has been adjudged to be a child or an unborn child in need of protection or services and placed, or continued in a placement, outside his or her home pursuant to one or more court orders . . . .

> . . . .

> 2.b. That the agency responsible for the care of the child and the family . . . has made a reasonable effort to provide the services ordered by the court.

> 3. That the child has been outside the home for a cumulative total period of 6 months or longer pursuant to such orders . . . and that the parent has failed to meet the conditions established for the safe return of the child to the home and there is a substantial likelihood that the parent will not meet these conditions within the 9-month period following the fact-finding hearing under s. 48.424.

659

orders and Luis's level of compliance, or lack thereof, with each. She testified that, although Luis expressed interest in having his son live with him, his conduct in attending only a minimal number of medical appointments and missing many scheduled visits with Vaughn demonstrated that he did not have the necessary commitment and resulted in his not having sufficient knowledge about Vaughn. She and the department doubted that Luis could meet Vaughn's significant needs and concluded that placement with Luis was not in Vaughn's best interests.

¶ 7. In his testimony Luis explained the reasons he had not met some of the conditions, the efforts he had made to change his life so that he would be able to care for Vaughn, and his plans for doing so. His efforts include drug and alcohol treatment, counseling, obtaining a different residence, and steps toward having a reliable means of transportation so that he can take Vaughn to all his appointments. His plans for caring for Vaughn include having the assistance of the woman he lives with and his brother.

¶ 8. Although the petition asserted that Vaughn was not subject to the ICWA, during the presentation of the County's case the court raised the question of its application because of a reference in the file to Luis having received counseling services from the Ho-Chunk Nation. The parties eventually agreed that the ICWA applied to Vaughn.[5] However, they disagreed over the

---

[5] An "Indian child" is defined in the ICWA to mean "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Vaughn's mother is an enrolled member of the Red Cliff Tribe, and on that basis, the parties agreed Vaughn comes within this definition. At the trial,

construction and application of two provisions, 25 U.S.C. § 1912(d) and (f):

> (d) Remedial services and rehabilitative programs; preventive measures. Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
>
> . . . .
>
> (f) Parental rights termination orders; evidence; determination of damage to child. No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serous emotional or physical damage to the child.

¶ 9. With respect to 25 U.S.C. § 1912(f), the County's position was that it did not apply because Vaughn had not been in Luis's care since February 2005. Luis's position was that it did apply. Luis moved for a dismissal at the close of the County's case on the ground that the social worker who testified for the County did not qualify as an expert within the meaning of subsec. (f) and did not present testimony making the showing required by that subsection.[6] The circuit court

Luis testified that he was connected to "four different nations," did not meet the qualifications for membership in two, and was waiting for a response from a third. No party suggests that whether Luis is a member of a tribe affects any issue on this appeal.

[6] Luis's counsel called the motion one for a directed verdict, and the other parties and the court adopted that term. However,

agreed with the County that subsec. (f) did not apply and denied Luis's motion for dismissal.

¶ 10. Although the court ruled that 25 U.S.C. § 1912(f) did not apply, it agreed to give special verdict question number 7 proposed by Luis:[7] "Is the removal of Vaughn . . . from the care of the [foster parents] likely to result in serious emotional or physical damage to the child?" The court also instructed the jury, at Luis's request, that in order to answer "yes" to this question, the jury must be convinced beyond a reasonable doubt and must be unanimous.

¶ 11. With respect to 25 U.S.C. § 1912(d) of the ICWA, the court submitted to the jury these two special verdict questions, to which both parties agreed:

> 5. Has the Monroe County Department of Human Services made an active effort to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family?

> 6. Have the efforts of the Monroe County Department of Human Services to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family been unsuccessful?

The court declined to instruct the jury, as Luis requested, that in order to answer "yes" to these ques-

---

a motion for a directed verdict comes at the close of all evidence, WIS. STAT. § 805.14(4). A defendant's motion at the close of plaintiff's case based on insufficient evidence is a motion to dismiss, see § 805.14(3), and we use this terminology.

[7] The three special verdict questions proposed by Luis that relate to the ICWA are not in the record, although it is clear from the transcript of the trial that they were presented to the County and the court and were the subject of discussion. As we read the transcript, Luis's proposed special verdict question number 5 became the special verdict question number 7 submitted to the jury and was the only special verdict question related to 25 U.S.C. § 1912(f).

tions, it must be convinced beyond a reasonable doubt. Instead, the court employed the clear and convincing standard, the burden of proof applied to the questions relating to Wis. Stat. § 48.415(2).[8]

¶ 12. The jury answered yes to the three special verdict questions relating to the ICWA and to the special verdict questions relating to Wis. Stat. § 48.415(2).[9] Following a dispositional hearing, the court entered an order terminating Luis's parental rights.

## DISCUSSION

¶ 13. On appeal Luis contends he is entitled to a new trial because of errors the circuit court made in

[8] There were four special verdict questions relating to Wis. Stat. § 48.415(2). Based on the parties' stipulation, the court answered "yes" to the first question, which was:

> 1. Has Vaughn R. been adjudged to be in need of protection or services and placed outside the home for a cumulative total period of six months or longer pursuant to one or more court orders containing the termination of parental rights notice required by law?

The other three questions were:

> 2. Did the Monroe County Department of Human Services make a reasonable effort to provide the services ordered by the court?

> 3. Has Luis R. failed to meet the conditions established for the safe return of Vaughn R. to Luis R.'s home?

> 4. Is there a substantial likelihood that Luis R. will not meet these conditions within the twelve-month period following the conclusion of this hearing?

[9] The jury was instructed that on questions 1–6 agreement by ten of the twelve jurors was sufficient to become the verdict of the jury. Two jurors answered "no" to question 4, indicating there was not a substantial likelihood that Luis would be unable to meet the conditions within twelve months of the hearing. The "yes" answer to all other questions was unanimous.

construing and applying the ICWA. First, he asserts, the circuit court erred in concluding that 25 U.S.C. § 1912(f) does not apply. Because it does apply, according to Luis, there must be a "qualified expert witness" to support the showing required by subsec. (f) and the county social worker who testified does not meet this standard. Second, with respect to subsec. (d), Luis argues that the proper burden of proof is beyond a reasonable doubt and the jury instruction using the clear and convincing evidence standard was therefore incorrect.

¶ 14. The County does not dispute that the ICWA in general applies, but asserts that the court correctly concluded that 25 U.S.C. § 1912(f) does not apply because Vaughn had not been in his father's custody for several years. With respect to subsec. (d), the County responds that, in applying a clear and convincing standard, the circuit court properly harmonized the Wisconsin Children's Code with the ICWA.[10]

I. Standard of Review

¶ 15. The issues before us require interpreting the ICWA and applying it to a given set of facts, thus presenting questions of law subject to de novo review. *See Preston v. Meriter Hosp.*, 2008 WI App 25, ¶ 18, 307 Wis. 2d 704, 747 N.W.2d 173. We employ the same rules of construction for federal statutes as we do for state statutes. *Id.*, ¶ 19. We begin with the language of the statute and give it its common meaning, except that

---

[10] Vaughn's guardian ad litem has advised us that she is not filing a brief because the briefs of Luis and the County clearly outline the issues.

technical or specially defined words are given their technical or special definitions. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. We interpret statutory language in the context in which it is used, not in isolation but as part of a whole, in relation to the language of surrounding or closely related statutes, and we interpret it reasonably to avoid absurd or unreasonable results. *Id.*, ¶ 46. We also consider the scope, context, and purpose of the statute insofar as they are ascertainable from the text and structure of the statute itself. *Id.*, ¶ 48.

¶ 16. If employing these principles, the meaning of the statute is plain, then we apply that plain meaning. *Id.*, ¶ 46. If, on the other hand, the language is ambiguous—that is, capable of being understood by reasonably well-informed persons in two or more senses —then we may consult sources extrinsic to the statutory text, typically items of legislative history. *Id.*, ¶¶ 47, 50. We may also consult legislative history to verify a plain-meaning interpretation. *Id.*, ¶ 51.

## II. Background on the ICWA

¶ 17. The purpose of the ICWA is to:

protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .

25 U.S.C. § 1902. These minimum federal standards must be applied in every state court proceeding involving an Indian child that meets the definition of a "child custody proceeding" as defined in 25 U.S.C. § 1903(1). A

TPR proceeding is included in that definition. 25 U.S.C. § 1903(1)(ii).

¶ 18. The ICWA does not preempt the Wisconsin Children's Code, and Wisconsin statutes can be harmonized with the federal law by applying any state law safeguards beyond those mandated by the ICWA. *I.P. v. State*, 166 Wis. 2d 464, 472–73, 480 N.W.2d 234 (1992). Thus, in a TPR proceeding involving an Indian child, the County must meet the substantive and procedural requirements of the ICWA, as well as proving the grounds for termination of parental rights as required by state law. *See id.* at 473–74.

III. Applicability of 25 U.S.C. § 1912(f)

¶ 19. The parties' dispute over the application of 25 U.S.C. § 1912(f) arises out of the meaning of the italicized words in the phrase "that the *continued custody* of the child by the parent . . . is likely to result in serious emotional or physical damage to the child" (emphasis added). The County, as we understand it, construes "custody" to mean "physical custody" and "continued custody" to mean that the parent must have physical custody when the TPR petition is filed. Luis asserts that the court in *I.P.* approved the application of subsec. (f) in a situation where the child had not been in the care of a parent for a significant amount of time and that the *I.P.* court's reasoning supports the application of subsec. (f) here.

¶ 20. In *I.P.* the child was removed from his mother's care when he was seven months old, a CHIPS petition was filed against both parents, and he was placed in foster care. *I.P.* at 470–71. Because of the parents' initial sporadic contact with the child and subsequent failure to have any contact for over a year, the

county department initiated a TPR proceeding and the circuit court terminated the parental rights of both parents. *Id.* at 471. One of the issues on appeal was whether the evidence was sufficient to fulfill the standard of 25 U.S.C. § 1912(f)—that "the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." *Id.* at 479. The mother argued that the evidence was insufficient because the social workers "did not testify to whether continued custody by the parents would harm [the child], but . . . whether [the child] would suffer harm if removed from his current foster placement and returned to his parents." *Id.* After noting that the parents "did not have physical custody of [the child] at the time of the trial" and considering the language of subsec. (f), the court stated:

> When the child is not in the custody of the parents for a protracted period of time, as in this case, it would be irrelevant to receive testimony as to whether or not the continued custody of the child by the parents will harm the child. Therefore, testimony as to what effect returning the child to the custody of the parents will have upon the child is probative of whether the continued custody of the child by the parents is likely to result in harm to the child.

*Id.*

¶ 21. As the circuit court here correctly pointed out, in *I.P.* the court was not asked to decide whether 25 U.S.C. § 1912(f) applied: the circuit court there had concluded it did and no party argued against that on appeal.[11] However, we disagree with the circuit court's

---

[11] In *I.P.* the circuit court instructed the jury that it must "unanimously agree beyond a reasonable doubt 'that the continued custody of the child by the parent . . . is likely to

resulting conclusion here that the analysis in *I.P.* does not for that reason provide guidance in this case. While the court in *I.P.* did not expressly rule that subsec. (f) applied, it did expressly rule that "testimony as to what effect returning the child to the custody of the parents will have upon the child is probative of whether the continued custody of the child by the parents is likely to result in harm to the child." *I.P.* at 479. This ruling necessarily means that the statutory requirement includes situations where the child is not in the custody of the parent at the time of trial. If it did not, evidence on the effect of returning the child to the custody of the parent would not be probative of whether the statutory requirement was met.

¶ 22. Although Luis's position is that *I.P.* supports the application of 25 U.S.C. § 1912(f) in this case, he also asserts that the analysis the *I.P.* court used unnecessarily limits the meaning of "custody" in subsec. (f) to physical custody or physical placement. He contends the better approach is to construe "custody" to include both legal and physical custody, as have at least two other courts. *See D.J. v. P.C.*, 36 P.3d 663, 670, 672 (Alaska 2001); *In re Adoption of Baade*, 462 N.W.2d 485, 490 (S.D. 1990). Luis asserts that he retained legal custody of Vaughn even though his son was placed in

result in serious emotional or physical damage to the child.' " *I.P. v. State*, 166 Wis. 2d 464, 474–75, 480 N.W.2d 234 (1992) (footnote and citation omitted). We note that the supreme court's only comment on this instruction was this statement in an accompanying footnote: "Although the ICWA does not explicitly require a unanimous verdict, its use is consistent with the highest burden of proof. As the issue is not presented by this review, we decline to decide whether a unanimous verdict was necessary." *Id.* at 474-75 n.5.

foster care. While making this argument, Luis recognizes that only the supreme court has the authority to modify or withdraw language from its opinions. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997).

¶ 23. We agree with Luis that the supreme court in *I.P.* apparently construed "custody" to mean physical custody, while also implicitly construing "continued custody" not to require that the parent have physical custody at the time of the TPR proceeding. We also agree with Luis that we may not modify the supreme court's analysis on this point by altering the meaning of "custody." This argument must be addressed to the supreme court.

¶ 24. We are satisfied that *I.P.* provides authority for applying 25 U.S.C. § 1912(f) in this case. However, even if it does not conclusively resolve the issue and we undertake our own analysis—consistent with the supreme court's apparent construction of "custody" to mean physical custody—we are persuaded that it is unreasonable to construe subsec. (f) to apply only if the child is in the physical custody of the parent when the TPR proceeding is filed.[12]

¶ 25. Such a construction is unreasonable because it ignores both the context of 25 U.S.C. § 1912(f) and the stated purpose of the ICWA. Subsection (d) begins with the language "any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law" and requires a showing

---

[12] Although we use the term "physical custody" here because that is the term used by the court in *I.P.*, we do not attempt to define it. It is not necessary to do so in order to decide whether Vaughn's placement in foster care makes 25 U.S.C. § 1912(f) inapplicable.

669

of unsuccessful efforts to provide remedial and reha-
bilitative services in both types of proceedings. Sub-
section (e) specifically addresses foster care proceed-
ings and establishes the substantive standard and
burden of proof by clear and convincing evidence for
this type of order. In a parallel structure, subsec. (f)
specifically addresses termination of parental rights
proceedings and establishes the substantive standard
and the highest burden of proof, beyond a reasonable
doubt, for this type of order. The only reasonable
reading of subsec. (f) in this context and in view of the
stated Congressional purpose of establishing "mini-
mum Federal standards," 25 U.S.C. § 1902, is that
§ 1912(f) applies to all TPR proceedings involving an
Indian child. It is unreasonable to suppose that Con-
gress intended to provide *no* substantive standard and
*no* burden of proof for TPR cases in which the parent
does not have physical custody of the child.

¶ 26. The great number of TPRs that would be
excluded from the protections of 25 U.S.C. § 1912(f)
under the County's construction is a further indication
of its unreasonableness. Indeed, it appears so unlikely
that a parent proceeded against in a TPR proceeding
would have physical custody of a child when the peti-
tion is filed that it is difficult to envision when subsec.
(f) would ever apply under such a construction. Focus-
ing on the grounds for a TPR under Wisconsin law, we
observe that a number of them require time periods
during which the child has not been in the physical
custody of the parent and thus the child will necessarily
not be in the physical custody of the parent when a TPR
petition is filed against them.[13] Most of the remaining

_____

[13] The CHIPS ground, alleged in this case, requires the
child to have been placed outside the home "for a cumulative

grounds involve events that are so damaging to the child that it is difficult to imagine a county department leaving the child in the physical custody of the parent while it files a petition to terminate parental rights.[14]

¶ 27. The County may mean that it is the length of time that Vaughn has been placed in foster care that makes 25 U.S.C. § 1912(f) inapplicable, thereby suggesting that subsec. (f) might apply if only a short period of time has elapsed since the child was removed from the parent's physical custody. However this is not a reasonable distinction. The shortest time period between a child's removal from the parent's physical custody and the filing of a TPR petition may well occur where the grounds are a single seriously damaging event rather than neglect followed by a continuing failure to meet court-imposed conditions for the child's return. The County offers no rationale for according parents in the former situation the protections of subsec. (f) but not the latter, and we discern none.

¶ 28. The County also has not provided any case from another jurisdiction that supports its position. Our own research has disclosed only three jurisdictions that have explicitly addressed whether "continued custody" in 25 U.S.C. 1912(f) means that the parent must

total period of 6 months or longer pursuant to [prescribed] orders . . . ." WIS. STAT. § 48.415(2)(a)3. Other examples are abandonment, § 48.415(1)(a); continuing parental disability, § 48.415(3); and continuing denial of periods of physical placement or visitation, § 48.415(4). The ground of failure to assume parental responsibility is similar in that the requirements are inconsistent with the parent having physical custody of the child. Section 48.415(6)(b).

[14] *See, e.g.,* WIS. STAT. § 48.415(5), child abuse, and § 48.415(8), homicide or solicitation to commit homicide of the other parent.

have physical custody of the child, and each has rejected that argument. *See D.J. v. P.C.*, 36 P.3d at 670; *In re Welfare of W.R.*, 379 N.W.2d 544, 549 (Minn. Ct. App. 1985); *Baade*, 462 N.W.2d at 490. In addition, without explicitly addressing the issue, numerous jurisdictions have applied subsec. (f) to situations in which the parent does not have physical custody of the child when the TPR proceeding is brought.[15]

¶ 29. We conclude that 25 U.S.C. § 1912(f) applies in this case even though Vaughn was placed with a foster family at the time this action was filed and had been living there for at least three years.

IV. "Qualified Expert Witnesses" Requirement of
 25 U.S.C. § 1912(f)

¶ 30. 25 U.S.C. § 1912(f) requires that the prescribed determination of likely serious emotional or physical damage to the child must be supported by "testimony of qualified expert witnesses . . . ." Although the circuit court ruled that subsec. (f) did not apply, before making that ruling it briefly addressed Luis's contention that there was no testimony from a qualified expert witness as required in this subsection. The court stated that the social worker who testified on behalf of the County, Laura Mahan, "probably qualified as an expert." The court referred to one of the categories in

---

[15] *See, e.g., Ben M. v. State*, 204 P.3d 1013, 1015, 1016, 1018, 1019–20 (Alaska 2009); *People v. D.D.*, 897 N.E.2d 917, 918, 919, 922–23 (Ill. App. Ct. 2008); *In re M.F.*, 206 P.3d 57, 59, 60, 62 (Kan. Ct. App. 2009); *In re M.D.M.*, 59 P.3d 1142, 1143, 1145 (Mont. 2002); *Noah v. Kelly B.*, 67 P.3d 359, 365, 366, 373 (Okla. Civ. App. 2003); *Department of Human Servs. v. K.C.J.*, 207 P.3d 423, 426, 431 (Or. Ct. App. 2009); *In re G.F.*, 923 A.2d 578, 579–81 (Vt. 2007).

the Bureau of Indian Affairs (BIA) guidelines for qualified expert witnesses under the ICWA, cited in *I.P.*: "[a] professional person having substantial education and experience in the area of his or her specialty." *I.P.*, 166 Wis. 2d at 477. The circuit court then stated:

> So I'm not especially persuaded by the notion that Ms. Mahan could not have testified to these issues and I recognize that there probably are better qualified experts to talk about ICWA issues, there probably isn't any question about that. But I'm more concerned about the fact that there hasn't been any evidence as to [the showing required by subsec (f)] and I just want to understand what the County's position is.

The County's attorney responded by arguing that subsec. (f) did not apply for the reasons we have discussed and rejected in the preceding section. Because the court agreed with the County, it denied Luis's motion to dismiss based on noncompliance with that subsection and did not return to the issue of "qualified expert witnesses" within the meaning of that subsection.

¶ 31. Luis views the court as having ruled that Mahan is a "qualified expert witness" within the meaning of 25 U.S.C. § 1912(f), and he contends this ruling was an erroneous exercise of discretion. Mahan testified that her job involves monitoring families for compliance with the conditions established by the court for the return of the child. She has held this job for seven years and has a bachelor's degree and a master's degree in criminal justice. She did not testify to having any knowledge about Indian culture or any experience or training in working with Indian families. Luis relies on the House Report on the ICWA to which the *I.P.* court referred in addressing a challenge to witnesses under subsec. (f): " 'qualified expert witnesses' is meant to apply to expertise beyond the normal social worker

673

qualifications." *I.P.,* at 476, (citing H.R. REP. No. 95–1386, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7545). Luis asserts that Mahan does not have expertise beyond that of a normal social worker, and he contrasts her experience and training with those of the witnesses approved by the court in *I.P. See id.* at 477–78.

¶ 32. The County's response, as we understand it, is that the circuit court did not rule that Mahan was a "qualified expert witness" within the meaning of 25 U.S.C. § 1912(f).[16] The County does not argue that Mahan meets this standard.

■■

¶ 33. We are not certain whether the circuit court intended its comments on Mahan's expertise to be a definitive ruling or a preliminary ruling that it was unnecessary to revisit because of the ruling that 25 U.S.C. § 1912(f) does not apply. Either alternative presents the issue whether this record provides a reasonable basis for a ruling that Mahan is a "qualified expert witness" within the meaning of the subsection. The qualification of witnesses as experts ultimately lies within the discretion of the circuit court. *I.P.,* 166

---

[16] The County's brief response to Luis's argument on this issue is as follows: "It is the position of Monroe County and, in fact, Monroe County does understand the court's ruling in this case to be substantially different. Monroe County does not believe that the county's social worker . . . was qualified as an expert pursuant to 25 U.S.C. sec. 1912(f)." In reply Luis explains that he understands the County to mean that the court "did not, in fact, qualify the County social worker as an expert," and he repeats his contention that the court *did* make this ruling. The County has not sought permission to correct Luis's interpretation of its statement, and we therefore accept Luis's interpretation of the County's position.

Wis. 2d at 471–72. We affirm discretionary decisions if the court applies the correct legal standard to the facts of record and reaches a reasonable result. *See Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. In this case the proper exercise of discretion depends upon a correct construction of the ICWA. *See I.P.*, 166 Wis. 2d at 476–78 (discussing the meaning of the term "qualified expert witness" in deciding whether the circuit court properly exercised its discretion).

■■■

¶ 34. Because of the County's lack of response to Luis's argument that Mahan is not a "qualified expert witness" under 25 U.S.C. § 1912(f), we could reverse and remand for a new trial without further discussion. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (we may treat a respondent's failure to respond to a proposition asserted in the appellant's brief as a concession). However, we choose to address the issue. We conclude a reversal and remand is necessary because a proper application of § 1912(f) to the facts of record does not reasonably lead to the conclusion that Mahan is a "qualified expert witness" within the meaning of subsec. (f).

¶ 35. We turn for guidance to *I.P.*, which held that the two social workers who testified for the county there were "qualified expert witnesses" under 25 U.S.C. § 1912(f). *I.P.*, 166 Wis. 2d at 478. The court first noted that, while the phrase was not defined in the ICWA, the House Report states that the phrase "is meant to apply to expertise beyond the normal social worker qualifications." *Id.* at 476 (citing H.R. Rep. No. 95–1386, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7545).

The court then referred to the Bureau of Indian Affairs' "Guidelines for State Courts" on the ICWA, which provide:

D.4. Qualified Expert Witnesses

(a) Removal of an Indian child from his or her family must be based on competent testimony from one or more experts qualified to speak specifically to the issue of whether continued custody by the parents or Indian custodians is likely to result in serious physical or emotional damage to the child.

(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty.

*Id.* at 476–77 (citing 44 Fed. Reg. 67593 (1979)). The *I.P.* court explained that, "[w]hile the above guidelines are not by themselves binding upon courts, we find that they are helpful and should be considered when deciding whether a witness is a qualified expert under the ICWA." *Id.* at 477.

¶ 36. One of the social workers in *I.P.* had an associate of arts degree in child development, a bachelor

of science in human services, and a master's degree in social work, had fourteen years experience as a social worker, was certified as a social worker by the State of Michigan, and was a full-blooded Chippewa Indian who had reared three children in the tribal tradition. *Id.* at 477–78. The other had a bachelor's degree, was certified as a social worker by the State of Michigan, had been involved in the social work field for approximately fifteen years, was a member of the tribe, was raised in the tribal tradition and had raised eight children in the tribal tradition, was active in a tribal outreach program, had established one of the first Indian child placement agencies in the United States, and was one of the drafters of the ICWA. *Id.* at 478. The court concluded that the circuit court did not erroneously exercise its discretion in determining that both were "qualified expert witnesses" within the meaning of the ICWA. *Id.*

¶ 37. Because in *I.P.* the court affirmed an exercise of the circuit court's discretion, we do not read *I.P.* to hold that 25 U.S.C. § 1912(f) requires that social workers must have qualifications comparable to those of the two testifying there. However we do read *I.P.* to construe subsec. (f) to mean, consistent with the House Report, that a social worker must have expertise beyond the normal social worker qualifications.

¶ 38. Turning to Mahan's qualifications, we first observe that, while she no doubt has specialized knowledge as a result of her bachelor's and master's degrees in criminal justice, that knowledge does not relate to the showing required by 25 U.S.C. § 1912(f)—assessing the likelihood of serious emotional or physical damage to Vaughn if he is returned to his father. Second, while she is an experienced social worker, her experience in monitoring the conditions imposed on parents for the

return of their children does not suggest something beyond normal social work qualifications or functions.

¶ 39. We next consider paragraph D.4.(b) of the BIA guidelines recognizing that they are not binding. Mahan's qualifications do not fall within D.4.(b)(i) or (ii). As for D.4.(b)(iii), "a professional person having substantial education and experience in the area of his or her specialty," this is a general description and the intended scope is not clear. However, to read it to include social workers with normal qualifications would be inconsistent with the clear statement of Congressional intent.[17] *See* H.R. REP. No. 95–1386, at 22 (1978).

---

[17] Some courts in other jurisdictions have required that social workers have experience with or knowledge of Indian culture in order to be a "qualified expert witness" within the meaning of 25 U.S.C. § 1912(f). *See, e.g., In re K.H.*, 981 P.2d 1190, 1195–97 (Mont. 1999) (concluding it is "highly preferable" for a witness to have such experience or knowledge and deciding that the social worker there, who testified she had had contact with Native American people on a regular basis, was not a qualified expert witness within the meaning of subsec. (f), and, in particular, did not come within paragraph D.4.(b)(iii) of the BIA Guidelines); *see also Doty-Jabbaar v. Dallas County Child Prot. Servs.*, 19 S.W.3d 870, 877 (Tex. Ct. App. 2000) (reversing because there was no evidence of the case worker's education and no evidence she was familiar with Indian culture and childrearing practices). The reasoning in these cases is generally that the ICWA is expressly based on the recognition of the ways in which a lack of understanding of Indian culture has caused Indian children to be removed from their families. *See, e.g., K.H.*, 981 P.2d at 1195–97. Other courts have held that, in cases where the basis for removal of the child clearly does not implicate cultural bias, the testifying expert need not possess special knowledge of Indian life. *See, e.g., State ex rel. Juvenile Dep't. v. Tucker*, 710 P.2d 793, 799 (Or. Ct. App. 1985) (recognizing general proposition that "qualified expert witness" under ICWA must possess special knowledge of social and cultural

¶ 40. Because we conclude that Mahan is not a "qualified expert witness" within the meaning of 25 U.S.C. § 1912(f), we reverse the circuit court's order terminating Luis's parental rights and remand for a new trial.[18]

---

aspects of Indian life; but concluding that, where issue was whether continued custody would result in serious emotional harm to child because of mother's mental illness, the expert witnesses did not need special knowledge of Indian life). We do not decide if or when D.4.(iii) or § 1912(f) requires experience with or knowledge of Indian culture because the parties have not briefed the issue and we base our conclusion on the fact that Mahan does not have qualifications beyond normal social worker qualifications.

[18] As noted earlier, Vaughn's pediatric neurologist testified concerning Vaughn's medical condition and problems. The court stated that he was an expert but that he did not address the issues identified in 25 U.S.C. § 1912(f). The County did not argue in the circuit court and does not argue on appeal that the neurologist's testimony alone satisfies the requirements of subsec. (f). While the neurologist provided essential information on Vaughn's medical condition and needs, he did not testify on the topic of the likelihood of serious emotional or physical damage to Vaughn if Vaughn were returned to Luis. *See* BIA "Guidelines for State Courts," para. D.4.(a), 44 Fed. Reg. 67593 (1979) (there must be "competent testimony from one or more experts qualified to speak specifically to the issue of whether continued custody by the parents . . . is likely to result in serious physical or emotional damage to the child").

A parent aide for Family Support Services, Ltd., who works under the direction of a social worker case manager, testified that she transported Vaughn to visits with Luis, supervised the visits, and taught Luis how to care for Vaughn during the visits. The County did not argue in the circuit court and does not argue on appeal that this witness was a "qualified expert witness" within the meaning of 25 U.S.C. § 1912(f).

## V. The Proper Burden of Proof for 25 U.S.C. § 1912(d)

██

¶ 41. Anticipating a new trial, we address Luis's contention that the court erred in instructing the jury that the clear and convincing burden of proof, rather than beyond a reasonable doubt, applied to the special verdict questions incorporating 25 U.S.C. § 1912(d) of the ICWA. Subsection (d) requires that the party seeking either foster care placement or termination of parental rights to an Indian child "under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Unlike subsecs. (e) and (f), there is no burden of proof specified in subsec. (d). Although the standard of beyond a reasonable doubt was used for the special verdict question incorporating subsec. (d) in both *I.P.*, 166 Wis. 2d at 474–75, and *Brown County v. Shannon R.*, 2005 WI 160, ¶¶ 103–04, 286 Wis. 2d 278, 706 N.W.2d 269, in neither case did the supreme court decide whether that was the proper burden of proof. In *Shannon R.* the court expressly noted that it was not deciding the issue and also noted the split in jurisdictions on the proper burden of proof to apply to subsec. (d). *Id.*, ¶ 104; n.63.

██ ██

¶ 42. We begin with the statutory language. 25 U.S.C. § 1912(d) plainly puts the burden on the party seeking to effect a foster care placement of or termination of parental rights to an Indian child to make the requisite showing, but it does not specify the degree of certainty with which that party must "satisfy" the court. The showing required by subsec. (d) relates to efforts made to prevent the breakup of the Indian family.

Subsections (e) and (f) require a different type of showing before both foster care placements of and termination of parental rights to an Indian child can be ordered—a showing relating to harm to the child. In contrast to subsec. (d), Congress plainly chose to mandate a burden of proof for this required showing, deciding on clear and convincing evidence before placing the child in foster care and the higher beyond a reasonable doubt standard before terminating parental rights. Under well-established principles of statutory construction we do not read extra words into a statute to achieve a particular result and, when the legislative body uses particular words in one subsection of a statute but not in another subsection, we conclude the legislative body specifically intended a different meaning. *Responsible Use of Rural and Agric. Land v. PSC*, 2000 WI 129, ¶¶ 37, 39, 239 Wis. 2d 660, 619 N.W.2d 888 (citing these principles and declining to read a limitation on the capacity of certain new utility construction, expressed in one section of the legislation, into another section that did not contain the limitation). Applying these principles, we conclude that Congress' specification of burdens of proof in § 1912(e) and (f) but not in subsec. (d) means that Congress did not intend to impose on the states a particular burden of proof for the showing required under subsec. (d).

¶ 43. Luis contends that 25 U.S.C. § 1912(d) does not specify a burden of proof because, as the subsection specifically states, it applies in both foster care placement and termination of parental rights proceedings, and each of those is treated separately in the subsequent two subsections, with each having a different burden of proof. When subsec. (d) is read together with subsecs. (e) and (f), according to Luis, it is logical to conclude that the appropriate burden of proof for the

subsec. (d) showing is clear and convincing evidence in foster care placement cases and beyond a reasonable doubt in TPR proceedings. The difficulty we have with Luis's argument is that he appears to assume that Congress intended to mandate *some* burden of proof for subsec. (d), without explaining why this is a reasonable assumption given the silence on this point.[19]

¶ 44. In general, the cases that have held that Congress intended the beyond a reasonable doubt standard to apply to 25 U.S.C. § 1912(d) in a TPR case have employed two rationales. One is that "logic compels" this result because a subsec. (d) showing is a "predicate" to a termination of parental rights, which requires the highest burden of proof. *See People in Interest of R.L.*, 961 P.2d 606, 609 (Colo. Ct. App. 1998); *In re Welfare of M.S.S.*, 465 N.W.2d 412, 418 (Minn. Ct. App. 1991). We

---

[19] The County contends that, in applying the clear and convincing burden of proof to the two questions incorporating 25 U.S.C. § 1912(d), the circuit court properly harmonized the requirements of the Wisconsin Children's Code and the ICWA in a manner consistent with *I.P.* However, the harmonization in *I.P.*, as we have explained above, involved applying the safeguards of the Wisconsin statute with the burden of proof mandated by state law, in addition to the ICWA safeguards utilizing the burden of proof mandated by the ICWA. Nothing in *I.P.* supports the proposition that we may use a state law burden of proof for the ICWA safeguards regardless of what burden of proof the ICWA requires. Indeed, because the ICWA provides the *minimum* standards, 25 U.S.C. § 1902, and requires that state law is to be used if it "provides a higher standard of protection," *I.P.*, 166 Wis 2d at 473 (citing 25 U.S.C. § 1921), we must begin by determining what the ICWA requires. Thus, we may employ a clear and convincing burden of proof to special verdict questions incorporating § 1912(d) only if the ICWA either mandates that or permits the states to choose to do so.

do not agree that logic compels this result. We see nothing illogical about mandating a burden of proof for the showing regarding harm to the child in § 1912 (e) and (f) and allowing states to choose the burden of proof for the showing in subsec. (d). Section 1912 plainly does not establish a comprehensive scheme for Indian child TPR proceedings, *see I.P.*, 166 Wis. 2d at 472–73, and nothing in the text suggests that Congress was establishing a uniform burden of proof for all elements in a TPR proceeding. Rather, Congress established certain elements that must be proved and established a burden of proof for some but not others.

¶ 45. A second rationale for concluding that Congress intended that a beyond a reasonable doubt standard apply to 25 U.S.C. § 1912(d) in a TPR case is that this best fulfills the Congressional purpose of protecting the Indian family. *See Welfare of M.S.S.* at 418; *In re G.S.*, 59 P.3d 1063, 1071 (Mont. 2002).[20] However, while it is plain from 25 U.S.C. § 1902 that a purpose of Congress was to protect Indian families by establishing minimum federal standards, it does not follow that Congress must have meant to do so by mandating the highest burden of proof in § 1912(d). We look to the text to see what Congress chose to impose as the minimum federal standards. Congress did not choose the highest burden of proof for the showing on harm to a child in foster care placement cases in subsec. (e), but instead plainly decided that a clear and convincing burden of

---

[20] The Montana Supreme Court also noted that such a result better fulfills the commitment of the State of Montana to preserving Indian families. *In re G.S.*, 59 P.3d 1063, 1071 (Mont. 2002). While this is a reason for a state to decide to apply a beyond a reasonable doubt standard to 25 U.S.C. § 1912(d) even if Congress did not mandate that, we do not see that a state's policy is a reason to construe the ICWA one way or the other.

proof was sufficient. And, while Congress imposed a substantive requirement on the states in subsec. (d) that will assist in preventing the breakup of Indian families, it evidently chose not to mandate a particular burden of proof for that substantive showing.[21] There is nothing illogical about this choice and we cannot agree that the purpose of the ICWA requires reading into subsec. (d) a particular burden of proof.

¶ 46. In the cases concluding that Congress did not intend to mandate a burden of proof for 25 U.S.C. § 1912(d), the primary rationale has been that which we have already articulated: Congress could have specified a burden of proof as it did in subsecs. (e) and (f) and its silence shows its intent not to mandate one. See *K.N. v. State*, 856 P.2d 468, 476 (Alaska 1993); *San Diego County Dep't. of Soc. Servs. v. Gina L.*, 74 Cal. Rptr. 2d 642, 648 (Cal. Ct. App. 1998); *Doe v. Roe*, 902 P.2d 477,

---

[21] In some cases the courts have simply held without explanation that a beyond a reasonable doubt standard applies to 25 U.S.C. § 1912(d) in termination of parental rights cases. *See People in the Interest of S.R.*, 323 N.W.2d 885, 887 (S.D. 1982) ("we assume that the same burden required to prove serious emotional or physical harm under § 1912(f), beyond a reasonable doubt, would also be required to prove active efforts by the party seeking termination"); *Department of Soc. Servs. v. Lawless*, 384 N.W.2d 843, 848 (Mich. Ct. App. 1986) (citing *Department of Soc. Servs. v. Morgan*, 364 N.W.2d 754, 758 (Mich. Ct. App. 1985), which cites *S.R.*); *In re L.N.W.*, 457 N.W.2d 17, 19 (Iowa Ct. App. 1990) (citing *Lawless*). Recently the Michigan court of appeals held that its previous decision in *Lawless* incorrectly employed the beyond a reasonable doubt standard for the requirements of § 1912(d) and it adopted the clear and convincing evidence standard because that was the default standard applicable for all Michigan cases involving the termination of parental rights. *In re Roe*, 764 N.W.2d 789, 797 (Mich. Ct. App. 2008).

482–83 (Idaho 1995); *In re Roe*, 764 N.W.2d 789, 797 (Mich. Ct. App. 2008); *State v. Martina A.*, 744 N.W.2d 55, 61 (Neb. 2008); *Johnson v. State*, 149 P.3d 1073, 1078 (Okla. Civ. App. 2006); *Applebee v. Department of Soc. & Health Servs.*, 22 P.3d 828, 833 (Wash. Ct. App. 2001).

¶ 47. Some of these courts have also considered the legislative history of 25 U.S.C. § 1912 and have decided that it supports the conclusion that Congress did not intend in § 1912(d) to impose on the states any particular burden of proof. *See K.N.*, 856 P.2d at 476 (citing H.R. REP. No. 95–1386, at 22 (1978)); *Doe v. Roe*, 902 P.2d at 482; *Applebee*, 22 P.3d at 833. Our own examination of the legislative history reveals nothing to suggest that Congress intended to impose a burden of proof on the showing required by § 1912(d) and confirms our view that Congress did not intend to do so.

¶ 48. The bill originally introduced, Senate Bill 1214, contained a requirement that is substantially similar to 25 U.S.C. § 1912(d): "... the party seeking to effect the child placement [must] affirmatively show ... that available remedial services and rehabilitative programs designed to prevent the breakup of the Indian family have been made available and proved unsuccessful."[22] Comments on this provision in the Senate Report accompanying the bill explained that

> [r]emedial and rehabilitative services are generally not made available to the Indian family in distress. The laws of some states mandate that agencies must make affirmative efforts to provide families with remedial

[22] *Indian Child Welfare Act of 1977: Hearing on S.1214 Before the S. Select Comm. on Indian Affairs*, 95th Cong. 29–30 (Aug. 4, 1977).

685

and rehabilitative services. [Section 101(a) of the bill] extends this requirement to all states when Indian families are involved.

S. Rep. No. 95–597, at 138 (1977). The explanation in the House Report of the slightly modified version that ultimately became § 1912(d) is similar. H.R. Rep. No. 95–1386, at 22 (1978).[23]

¶ 49. Senate Bill 1214 also contained the precursor to 25 U.S.C. § 1912(e) and (f) in another subsection that did not distinguish between foster care placement and TPR proceedings and used a clear and convincing standard.[24] When Senate Bill 1214 was sent to the House of Representatives, the clear and convincing evidence standard was initially changed to a beyond a reasonable doubt standard. H.R. 12533, 95th Cong. § 102(e) (1978); *see also* H.R. Rep. No. 95–1386, at 22 (1978). This was again changed to require a beyond a reasonable doubt standard only for TPR cases and a

---

[23] In a section-by-section analysis of the Act, the House Report explains:

> Subsection (d) provides that a party seeking foster care placement or termination of parental rights involving an Indian child must satisfy the court that active efforts have been made to provide assistance designed to prevent the breakup of Indian families. The committee is advised that most State laws require public or private agencies involved in child placements to resort to remedial measures prior to initiating placement or termination proceedings, but that these services are rarely provided. This subsection imposes a Federal requirement in that regard with respect to Indian children and families.

H.R. Rep. No. 95–1386, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7545.

[24] *Indian Child Welfare Act of 1977: Hearing on S. 1214 Before the S. Select Comm. on Indian Affairs*, 95th Cong. 30 (Aug. 4, 1977).

clear and convincing evidence standard for foster care placements, as in current § 1912(e) and (f). H.R. REP. No. 95–1386, at 22 (1978).

¶ 50. There is no indication in these changes or the discussions of them contained in the above-cited reports that the showing relating to affirmative efforts to prevent the breakup of the family was intended to be subject to the burden(s) of proof established for the showing regarding the harm to the child. Congress was concerned with what burden of proof to require for the showing regarding harm to the child but we can find no indication of an intent to tie that to the showing required by 25 U.S.C. § 1912(d).

¶ 51. We conclude that Congress plainly did not intend to mandate a particular burden of proof for the showing required in 25 U.S.C. § 1912(d). The trial court here instructed the jury that it must be convinced by clear and convincing evidence that the requirements of subsec. (d) were met. That is the burden of proof applied for finding grounds for termination of parental rights under Wisconsin law. *See* WIS. STAT. §§ 48.31, 48.424(2). Luis does not develop an argument that, if the ICWA does not mandate the beyond a reasonable doubt standard for the § 1912(d) showing in TPR cases, we should nonetheless apply that heightened standard. Accordingly, we conclude the circuit court properly instructed the jury on the burden of proof for special verdict questions 5 and 6, which incorporated the requirements of subsec. (d).

## CONCLUSION

¶ 52. We conclude that 25 U.S.C. § 1912(f) applies even though Vaughn has been living with foster parents for several years. Because subsec. (f) applies, the

687

County was required to prove beyond a reasonable doubt, by evidence that includes testimony of "qualified expert witnesses," that returning Vaughn to Luis "is likely to result in serious emotional or physical damage" to Vaughn. We conclude the record does not provide a reasonable basis for deciding that the county social worker is a "qualified expert witness" within the meaning of subsec. (f). Accordingly, we reverse and remand for a new trial. We also conclude the instruction to the jury that the showing required by subsec. (d) must be proved by clear and convincing evidence is a proper statement of the law.[25]

*By the Court.*—Order reversed and cause remanded.

■■■■■■■

[25] As noted in paragraph 10, at Luis's request the court submitted to the jury a special verdict question asking: "Is the removal of Vaughn R. from the care of [the foster parents] likely to result in serious emotional or physical damage to the child?" As we understand the transcript, Luis believed this was the verdict question incorporating 25 U.S.C. § 1912(f) given in both *I.P.*, 166 Wis. 2d at 479, and *Brown County v. Shannon R.*, 2005 WI 160, ¶¶ 93 n.55, 95, 286 Wis. 2d 278, 706 N.W.2d 269. However, we do not see where in *I.P.* the court recites a special verdict question incorporating § 1912(f); and in *Shannon R.* the special verdict question was: "Would the return of custody of the child to [the parent] likely result in serious emotional or physical damage to the child?" *Shannon R.*, 286 Wis. 2d 278, ¶ 93 n.55. We do not decide whether Luis's requested special verdict question correctly incorporates the requirements of § 1912(f), and nothing in this opinion requires that the same question be submitted to the jury in a new trial.