COURT OF APPEALS
DECISION
DATED AND FILED

November 27, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1133**

STATE OF WISCONSIN

Cir. Ct. No. 2022CV2323

IN COURT OF APPEALS
DISTRICT IV

CHRISTOPHER LEACH, DANIEL CUNNINGHAM AND PV WEALTH ADVISORS, LLC,

   PETITIONERS-APPELLANTS,

 V.

STATE OF WISCONSIN DEPARTMENT OF FINANCIAL INSTITUTIONS, DIVISION OF SECURITIES,

   RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed*.

Before Blanchard, Nashold, and Taylor, JJ.

¶1       NASHOLD, J. Christopher Leach, Daniel Cunningham, and PV Wealth Advisors, LLC ("PV Wealth")—collectively, "the appellants"—appeal a circuit court order affirming an administrative decision by the Wisconsin Department of Financial Institutions ("DFI") which determined that the appellants

violated various provisions of WIS. STAT. ch. 551 (2021-22).[1] The appellants managed Kelly Seago's brokerage accounts, initially totaling more than $540,000, for over two years, during which time Seago's accounts lost approximately one-third of their value. A DFI hearing examiner determined that the appellants violated WIS. STAT. § 551.501(2) and (3) by committing fraud in connection with the offer, sale, or purchase of securities; that PV Wealth violated WIS. STAT. § 551.401(1) by transacting business in Wisconsin as an unregistered broker-dealer; and that Cunningham violated WIS. STAT. § 551.402(1) by transacting business in Wisconsin as an unregistered agent of PV Wealth. The appellants petitioned for judicial review, and the circuit court affirmed DFI's decision.

¶2 On appeal, the appellants argue that: DFI lacked jurisdiction under WIS. STAT. § 551.613 to bring an enforcement action for the alleged violations of WIS. STAT. ch. 551 because there was no "offer to sell" made in Wisconsin; PV Wealth and Cunningham do not meet the statutory definitions of a "broker-dealer" and an "agent," respectively; and there is not substantial evidence to support the hearing examiner's finding that Seago was a client of PV Wealth. We reject these arguments.

¶3 We conclude that the appellants made an "offer to sell" in Wisconsin when they offered to sell securities on Seago's behalf. Further, we conclude that PV Wealth was a "broker-dealer" and that Cunningham was PV Wealth's "agent" because PV Wealth was "engaged in the business" of effecting securities transactions on Seago's behalf, notwithstanding that PV Wealth was not paid for

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

its services. Finally, we conclude that there is substantial evidence in the record to support a finding that Seago was a client of PV Wealth.

¶4    Accordingly, we affirm.

## BACKGROUND

¶5    The following facts are derived from the findings of fact made by the DFI hearing examiner following an administrative hearing.

¶6    At all times relevant to these proceedings, Seago was a resident of Onalaska, Wisconsin. In 2010, Seago suffered a career-ending workplace injury for which she received a state worker's compensation settlement in 2015 in the net amount of $310,910. Seago also had $231,113.73 in retirement funds. Together, these amounts represented her total net worth.

¶7    Seago and Leach knew each other because Leach had worked as a cardiothoracic surgeon at the same hospital where Seago had worked as a cardiac sonographer. Leach changed careers in 2008 and became a registered investment advisory representative for an investment advisory firm in Wisconsin. In September 2014, Leach moved to California to live with Cunningham, whom he later married. Cunningham was self-employed as a tutor at PV Test Prep, a business he owned and operated. Leach formally resigned from the investment advisory firm in Wisconsin at the end of 2014, and he ceased being a registered investment advisor representative in Wisconsin in January 2015.

¶8    In 2015, Leach told Seago over the phone that he and Cunningham were starting a business together, and Leach touted Cunningham's experience

trading and managing investment accounts.[2] Leach directed Seago to Cunningham's Facebook page, where Cunningham represented that he was a certified financial planner and listed his "Professional Skills" as including "Financial products, Derivatives market, Derivative (finance), Leverage (finance), Certified Financial Planner, Stock trading, Financial analysis, Financial Services, Short selling, Hedge Fund, Foreign currency, Futures exchange, Options strategy, Forex Trading, Commodities exchange, and Investment Management." In fact, Cunningham was not a certified financial planner and did not possess any professional financial skills whatsoever.

¶9 Leach and Cunningham organized a Skype meeting with Seago. During the meeting, Leach and Cunningham told Seago that they were starting their own business, PV Wealth. They also told Seago that they would be honored to have Seago as their first client and they discussed the financial services that PV Wealth could provide to Seago. PV Wealth is a California LLC and Cunningham is its founder and sole managing member.[3] Leach and Cunningham also told Seago during the meeting that they would charge her a small percentage of each transaction as their fee. Seago agreed to invest her worker's compensation settlement and retirement funds with PV Wealth. Seago had no financial, investment, or business experience and she had never worked with a broker-dealer or investment adviser before.

---

[2] Although the hearing examiner did not make specific findings as to where the parties were located during their phone calls and other communications described in this opinion, the parties do not dispute that, with one exception when the parties met for dinner in Wisconsin, the communications occurred while Seago was in Wisconsin and Leach and Cunningham were not.

[3] PV Wealth was eventually placed in suspended status by the California Secretary of State.

¶10    Leach and Cunningham communicated with Seago in Wisconsin regarding her investments via texts, emails, and phone calls. Seago told Leach and Cunningham that her financial goal was to preserve her capital and to live off her worker's compensation settlement for the rest of her life. In her answers to a "Risk Tolerance Questionnaire," she indicated that she "wished to trail the stock market and make a moderate profit" and that she "would have a hard time tolerating any losses."

¶11    Leach and Cunningham devised an investment plan for Seago's worker's compensation settlement, which the state required for the settlement to be released to Seago. Leach emailed the plan to Seago's worker's compensation attorney, Ron Fitzpatrick, identifying himself in his email signature as an "Investment Adviser Representative." Leach also identified himself during a phone call with Fitzpatrick as a "licensed financial advisor," even though Leach was not licensed or registered in either California or Wisconsin as any type of investment advisor. The investment plan that Leach and Cunningham devised for Seago's worker's compensation settlement was to place those funds in large cap stocks. The plan did not mention more high risk investment strategies, such as margins or options trading, or leveraged and inverse exchange-traded funds (ETFs). Fitzpatrick provided the Worker's Compensation Division with a copy of the investment plan for the Division's approval, and the Division ordered in April 2015 that the settlement be paid to Seago and PV Wealth for investment.

¶12    In June 2015, Seago deposited $542,023.73 at Charles Schwab, which included her worker's compensation settlement and her retirement funds. Seago signed limited power of attorney applications so that Cunningham could trade securities from Seago's Charles Schwab brokerage accounts on Seago's behalf, and Cunningham made all of the trading and investment decisions for

Seago's accounts. Shortly after PV Wealth began to manage Seago's brokerage accounts, Leach and Cunningham sought and obtained authorization from Seago to engage in speculative trading activity, such as trading on margin, trading options, and investing in leveraged and inverse ETFs, which was not consistent with the original investment plan. At no time did Leach and Cunningham tell Seago, who relied on Leach and Cunningham to advise her, about the risks associated with these types of trades.

¶13 By the end of June 2015, the first month that PV Wealth managed Seago's accounts, Seago had lost $10,958.54. During the first three months that PV Wealth managed Seago's accounts, Seago lost $120,260.91. In total, over the 29 months that PV Wealth managed Seago's investment accounts, Seago lost $176,599.98, or 32.58% of her original investment.

¶14 Leach and Cunningham did not inform Seago about these losses. For example, Seago received letters from Charles Schwab because the losses in Seago's accounts triggered margin and maintenance calls as a result of the account values dropping below maintenance requirements. When Seago texted Cunningham about one such letter from Charles Schwab identifying a margin call of $30,289 for her worker's compensation account, Cunningham texted her, "This is a lie!" and "They are 100% wrong." Cunningham instructed Seago to shred the letter and others like it. Eventually, frustrated by the margin call letters and Charles Schwab's refusal to grant Cunningham increased trading permissions, Leach and Cunningham recommended that Seago transfer her investment funds to Fidelity, and Seago did so. On another occasion, Seago sent Cunningham a screenshot showing a figure of $671,804, and asked Cunningham if that reflected how much was in her account. Cunningham responded, "yes," even though Seago's account balances never approached that amount. Further, in August 2015

Leach and Cunningham traveled to Wisconsin and invited Seago to dinner, at which they falsely told Seago that her investments were performing well. Leach and Cunningham did not disclose that Seago had lost $55,619.42 by the end of July 2015. More generally, during the 29 months that PV Wealth managed Seago's investment accounts, Leach and Cunningham repeatedly assured her that her accounts were performing well.

¶15 Seago did not learn of her accounts' losses until November 2017, when, prompted by Leach and Cunningham's delay when she sought to withdraw money for dental work, she made an appointment at Edward Jones. It was only then that Seago learned the extent of her losses, that Cunningham had never been a certified financial planner, that PV Wealth was not a registered investment advisor firm, and that PV Wealth had not been charging her a fee.

¶16 DFI conducted an investigation and issued summary orders alleging that the appellants violated various provisions of WIS. STAT. ch. 551. The appellants filed a motion to dismiss the orders, arguing that, under WIS. STAT. § 551.613, DFI lacked jurisdiction to pursue the alleged violations of chapter 551 because no "sale" or "offer to sell" was made in Wisconsin. The hearing examiner denied those motions.[4] A four-day administrative hearing was held before a DFI hearing examiner.

¶17 The DFI hearing examiner determined that the appellants violated WIS. STAT. § 551.501(2) and (3) by committing fraud in connection with the offer,

---

[4] DFI issued summary orders against the appellants in February 2021, and then issued amended summary orders in April 2021. The differences between the original and amended summary orders are not relevant on appeal, and the appellants moved to dismiss both the original and amended orders.

sale, or purchase of securities; that PV Wealth violated WIS. STAT. § 551.401(1) by transacting business as a broker-dealer in Wisconsin without registration; and that Cunningham violated WIS. STAT. § 551.402(1) by transacting business as an agent of PV Wealth in Wisconsin without registration.

¶18    The appellants petitioned for judicial review, and the circuit court affirmed DFI's decision. The appellants now appeal to this court. Additional facts are provided as necessary in the discussion that follows.

## STANDARDS GOVERNING REVIEW

¶19    We review the administrative agency's decision, not the circuit court's. *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21.

¶20    When reviewing an agency's findings of fact, we will "not substitute [our] judgment for that of the agency as to the weight of the evidence on any disputed finding of fact," and we will only "set aside [the] agency action or remand the case to the agency if [we] find[] that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." WIS. STAT. § 227.57(6). "An agency's findings are supported by substantial evidence if a reasonable person could arrive at the same conclusion as the agency, taking into account all the evidence in the record." *Clean Wisconsin, Inc. v. PSC*, 2005 WI 93, ¶46, 282 Wis. 2d 250, 700 N.W.2d 768.

¶21    "When reviewing questions of law decided by an agency, including statutory interpretation, our review is de novo." *DOR v. Microsoft Corp.*, 2019 WI App 62, ¶13, 389 Wis. 2d 350, 936 N.W.2d 160 (citing WIS. STAT. § 227.57(11)). However, we also accord "due weight" to "the experience,

technical competence, and specialized knowledge of the agency involved." Sec. 227.57(10).

¶22 This appeal requires us to interpret statutes. When we interpret a statute, we begin with the statute's text. **Kalal v. Circuit Ct. for Dane Cnty.**, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We give the text its common, ordinary, and accepted meaning unless technical or specially defined words are used, and if the text's meaning is clear, our analysis ordinarily ends there. **Id.** Additionally, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." **Id.**, ¶46.

¶23 Specifically, this appeal requires us to interpret various provisions of WIS. STAT. ch. 551, sometimes referred to as Wisconsin's "blue sky law," which we construe liberally in order to effect the chapter's remedial purpose of protecting investors. *See* **State v. McGuire**, 2007 WI App 139, ¶12, 302 Wis. 2d 688, 735 N.W.2d 555 ("Because the entire purpose of 'blue sky' laws is to protect investors, the law must be liberally construed to carry out that plain legislative intent."); **Klatt v. Guaranteed Bond Co.**, 213 Wis. 12, 250 N.W. 825, 829 (1933) ("When we consider that the entire purpose of the so–called 'Blue Sky Law' is to protect the investors of this state and to restrain the floatation and sale of improvident securities, it is apparent that the law should receive liberal construction for the purpose of carrying out that very manifest legislative intent."). Chapter 551 is modeled after the Uniform Securities Act of 2002, and "we find instructive case law interpreting federal securities legislation … and case law from other jurisdictions that have enacted the Uniform Securities Act." **McGuire**, 302 Wis. 2d 688, ¶12; *see also* WIS. STAT. § 551.615 ("This chapter shall be so

construed as to effectuate its general purpose to make uniform the law of those states which enact the 'Uniform Securities Act of 2002' and to coordinate the interpretation and administration of this chapter with related federal regulation.").

## DISCUSSION

¶24 The appellants challenge DFI's decision on three grounds. First, they argue that, under WIS. STAT. § 551.613, DFI did not have jurisdiction to bring this enforcement action. Second, they contend that PV Wealth did not act as a "broker-dealer" as defined in WIS. STAT. § 551.102(4), and that PV Wealth and Cunningham are thus not subject to WIS. STAT. § 551.401 and WIS. STAT. § 551.402's registration requirements. Finally, they argue that there was not substantial evidence to support a finding that Seago was a client of PV Wealth.[5] We address, and reject, each of the appellants' arguments in turn.

### I. The appellants' jurisdictional arguments fail.

¶25 The appellants argue that DFI does not have jurisdiction under WIS. STAT. § 551.613 because the appellants did not make an "offer to sell" in Wisconsin. Pursuant to § 551.613, titled "Jurisdiction," the provisions that the appellants were alleged to have violated—WIS. STAT. §§ 551.501(2) and (3), 551.401(1), and 551.402(1)—"do not apply to a person that sells or offers to sell a security unless the offer to sell or the sale is made in this state." Relevant here, "[A]n offer to sell … a security is made in this state, whether or not either party is then present in this state, if the offer … is directed by the offeror to a place in this

_____

[5] We note that the appellants do not challenge the substance of the fraud violation—that is, they do not argue that the representations they undisputedly made to Seago were not fraudulent.

state and received at the place to which it is directed ….” Sec. 551.613(3)(b). An "offer to sell" "includes every attempt or offer to dispose of, or solicitation of an offer to purchase, a security or interest in a security for value." WIS. STAT. § 551.102(26).

¶26    The appellants' argument consists of two parts. First, the appellants argue that their offer was not an "offer to sell" because they did not offer to sell particular securities *to* Seago in Wisconsin, but instead offered only to sell unspecified securities *on her behalf*, and that these sales occurred online from the appellants' location in California to unknown third parties in unknown locations. Alternatively, the appellants argue that they did not make an offer to sell because they received no monetary compensation for their services.[6] For the reasons that follow, we reject these arguments.

---

[6] The appellants raise an alternative argument that we do not address. Specifically, the appellants argue that there is no jurisdiction under WIS. STAT. § 551.613 because there were no sales made in Wisconsin. DFI, for its part, relies primarily on its argument that the appellants' conduct constituted an offer to sell, but DFI also suggests at various points in its briefing and at oral argument that the conduct amounted to sales in Wisconsin. *See* § 551.613 (pertinent sections "do not apply to a person that sells or offers to sell a security unless the offer to sell or the sale is made in this state"). Likewise, in its nonparty brief, the North American Securities Administrators Association, Inc., argues that, by trading securities in Seago's brokerage account, the appellants sold securities in Wisconsin. Because we agree with DFI that there is jurisdiction as a result of an offer to sell that was made in Wisconsin, we do not address whether any sales were made in Wisconsin. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

Separately, we observe that under WIS. STAT. § 551.613, the provisions of WIS. STAT. ch. 551 that the appellants violated are applicable not only when a sale or an offer to sell is made in Wisconsin but also when there is a purchase or an offer to purchase made in Wisconsin. *See* § 551.613(1) and (2). Relatedly, the definition of "offer to sell," includes not only "every attempt or offer to dispose of" a security, but also a "solicitation of an offer to purchase" a security. WIS. STAT. § 551.102(26). Here, the parties do not dispute that the appellants purchased, as well as sold, securities on Seago's behalf. However, DFI argues that there is jurisdiction based on an offer to sell that the appellants made in Wisconsin and the parties focus on the selling rather than the purchasing aspect of the "offer to sell" definition. Because an offer to sell is sufficient for

(continued)

### A. *The appellants' offer to sell securities on Seago's behalf was an "offer to sell" that was made in Wisconsin.*

¶27 "[A]n offer to sell … a security is made in this state, whether or not either party is then present in this state, if the offer … is directed by the offeror to a place in this state and received at the place to which it is directed …." WIS. STAT. § 551.613(3)(b). The parties' arguments on this issue center on the appellants' offer to sell securities on Seago's behalf. The parties do not dispute that this offer was "made in this state" for purposes of § 551.613—that is, the parties do not dispute that, although the appellants made the offer while they were in California, they directed the offer to, and the offer was received by, Seago while she was in Wisconsin. Instead, the parties dispute whether this offer constitutes an "offer to sell" as defined by WIS. STAT. § 551.102(26). The appellants argue that, because they did not offer to sell specific securities *to* Seago, there was no offer to sell, and that DFI therefore lacks jurisdiction. In contrast, DFI argues that the appellants made an "offer to sell" by offering to sell securities *on behalf* of Seago.[7]

_____

jurisdiction under § 551.613, we do not address whether the appellants made any purchases or offers to purchase in Wisconsin.

[7] DFI appears to offer alternative options as to when exactly the "offer to sell" occurred. For example, DFI argues that the initial Skype "solicitation meeting alone is sufficient to satisfy the definition of 'offer to sell' and thus the jurisdictional requirements" of WIS. STAT. ch. 551. At another point they argue that "Leach and Cunningham's communications with Seago, soliciting her money to allow them to buy and sell securities on her behalf, coupled with their communications to Attorney Fitzpatrick regarding the proposed PV Wealth investment plan, are more than sufficient to establish jurisdiction …." For their part, although the appellants argue that an offer to sell securities on behalf of someone is not an "offer to sell," they do not dispute that either their initial solicitation by Skype or their collective actions in soliciting Seago's business would constitute an offer to sell securities on Seago's behalf. Accordingly, we need not determine the precise point at which the "offer to sell" occurred.

We also note that at oral argument DFI made a jurisdictional argument that it had not presented in its appellate briefing—that even if the appellants are correct and there was no offer to sell made in Wisconsin under the "Jurisdiction" statute, WIS. STAT. § 551.613, DFI nonetheless has jurisdiction pursuant to what DFI states is a general grant of authority and jurisdiction found

(continued)

12

¶28 This appears to be an issue of first impression in Wisconsin. The parties do not cite, and we have not discovered, any Wisconsin case law that addresses whether an offer to sell securities includes an offer to sell securities on someone's behalf. Nor do we consider any of the nonbinding case law cited by the parties to be particularly instructive. As a result, we are left with only the language of the statute. Interpreting that language, bearing in mind our duty to liberally construe it to achieve WIS. STAT. ch. 551's remedial purpose, and in the absence of any persuasive arguments from the appellants, we agree with DFI and conclude that the appellants' offer here was an "offer to sell" as defined in WIS. STAT. § 551.102(26).

¶29 The definition of "offer to sell" under WIS. STAT. § 551.102(26) is not limited, on its face, to offers to sell securities *to* individuals. As previously noted, "offer to sell" is defined in pertinent part as including "every … offer to dispose of … a security," which can be fairly understood as including both offers to sell securities *to* individuals and offers to sell securities *on behalf of* individuals, particularly given that we must construe § 551.102(26)'s definition of "offer to sell" liberally to carry out WIS. STAT. ch. 551's remedial purpose. *See McGuire*, 302 Wis. 2d 688, ¶12. And, as we explain below, the appellants do not persuasively argue, based on the language of § 551.102(26) (or any other provision of chapter 551), that an offer to sell is limited to an offer to sell securities to someone rather than on behalf of someone.

---

in WIS. STAT. §§ 551.601, 551.602, and 551.604, because § 551.613 is a jurisdictional exception that applies only to those who sell or offer to sell securities. We ordered supplemental briefing on this issue. Because we conclude that the appellants' offer to sell securities on Seago's behalf is an offer to sell that was made in Wisconsin under § 551.613, we need not consider this alternative argument. *See Barrows*, 352 Wis. 2d 436, ¶9.

¶30    The appellants emphasize that WIS. STAT. § 551.102(26) defines "offer to sell" as including "every attempt or offer to dispose of, or solicitation of an offer to purchase, **a security**," and, according to the appellants, their offer was not an offer to sell securities, but was instead "a solicitation to provide *investment advice*" under WIS. STAT. § 551.502, a provision which DFI did not allege that the appellants violated.  *See* § 551.502 (titled "Prohibited Conduct in Providing Investment Advice").  However, assuming without deciding that the appellants offered investment advice, the appellants have not shown, nor do we discern, how this would preclude a conclusion that they also made an offer to sell.  As noted earlier, the appellants do not dispute that Cunningham signed on to Seago's online brokerage accounts and bought and sold securities on Seago's behalf, nor do they dispute that their offer was to buy and sell securities on Seago's behalf.  As a result, even if the appellants offered to provide investment advice to Seago, they also offered to sell securities on Seago's behalf, which we have concluded constitutes an "offer to sell" securities under § 551.102(26).  For these reasons, we reject the appellants' argument that their offer was to provide only "investment advice" and was not an "offer to sell."[8]

¶31    In support of their argument, the appellants also rely on *State v. Lundberg*, 310 Kan. 165, 445 P.3d 1113 (2019).  However, in addition to being nonbinding, *Lundberg* is substantially distinguishable.  In *Lundberg*, the Kansas

---

[8] To the extent that the appellants argue that no "offer to sell" was made in Wisconsin because they sold the securities while in California and there is no evidence that any of the sales were made in Wisconsin, we reject that argument.  Under WIS. STAT. § 551.613, there is jurisdiction when an "offer to sell," which WIS. STAT. § 551.102(26) defines expansively, is "directed" to and "received" by an individual in Wisconsin; therefore, it is of no consequence whether the person making the offer was present in Wisconsin or whether an actual sale was made in Wisconsin.  *See* § 551.613(3)(b).

Supreme Court addressed whether sales or offers to sell were made in Kansas such that there was jurisdiction for criminal charges against the defendants under the Kansas Uniform Securities Act ("KUSA"). *Id.* at 166. The defendants were Minnesota residents who, as principals for Kansas LLCs, sold securities through California intermediaries to individuals who did not reside in Kansas. *Id.* Interpreting language identical to the jurisdictional language in WIS. STAT. §§ 551.613 and 551.102(26)'s definition of "offer to sell," the *Lundberg* court concluded that "[t]he offers originated with the California intermediaries," that no sales or offers to sell were made in Kansas, and that there was thus no jurisdiction. *Id.* at 176. The *Lundberg* court explained,

> While we recognize the offers were extended on behalf of the Kansas LLCs, we find no support for an interpretation of the KUSA that would allow a Kansas court to exercise criminal jurisdiction only because the entity purportedly benefiting from the security issuance was organized under Kansas law and has a place of business in Kansas when no act in connection with the sale or offer occurred in Kansas.

*Id.* In *Lundberg*, there was no offer directed to and received by an individual in Kansas. Instead, the *Lundberg* court determined whether the offers to sell *originated* in Kansas and were thus "made in" the state so as to confer jurisdiction. *Id.* at 175. Significantly, the *Lundberg* court did not address whether the offers at issue were "offers to sell." In contrast, here the issue is whether the appellants' offer to sell securities on Seago's behalf constitutes an "offer to sell" such that there is jurisdiction under § 551.613, and the appellants do not dispute that this

offer was directed to and received by Seago in Wisconsin. Because ***Lundberg*** does not address the issue presented here, it does not assist the appellants.[9]

> *B. The appellants' offer was an "offer to sell" even though the appellants did not receive compensation.*

¶32    The appellants also argue that an "offer to sell" is defined to include an offer to dispose of a security "for value," and that because the appellants did not receive compensation, they did not make an offer to sell.[10]  *See* WIS. STAT. § 551.102(26) ("'[O]ffer to sell' includes every attempt or offer to dispose of, or solicitation of an offer to purchase, a security or interest in a security *for value*." (emphasis added)).  In contrast, DFI argues that "for value" "simply means that the security cannot be disposed of for free."  Alternatively, DFI argues that the appellants received "value" in that they received the opportunity to establish a successful business reputation through their activities on Seago's behalf.

¶33    Addressing DFI's first argument, we observe that although WIS. STAT. § 551.102(26) states that an offer to sell must be an offer to dispose of securities "for value," as DFI points out, § 551.102(26) does not state that the person making the offer, specifically, must receive the value.  Here, the appellants

---

[9]  In fact, as DFI points out, ***Lundberg*** contains persuasive language exemplifying the broad reach of the phrase "offer to sell."  For example, the ***Lundberg*** court observed that the words "every attempt" and "solicitation" used in the definition of "offer to sell" make it "'evident that it is extremely easy to make an offer very early in the sales or negotiation process,'" and that "'[e]ven an agreement to reach an agreement to sell stock would be, at least an 'offer to sell,' which is prohibited.'" ***State v. Lundberg***, 310 Kan. 165, 174, 445 P.3d 1113 (2019) (citations omitted).

[10]  In using the term "compensation," it is clear that the parties intend to refer to monetary compensation.  We follow that assumption solely for the purpose of resolving this appeal and we do not address the hypothetical situation in which alleged "compensation" might come in a different form.

offered to sell securities on Seago's behalf "for value" in that, pursuant to the appellants' offer, Seago was to receive value in exchange for the securities that the appellants sold; that is, the appellants were not offering to give Seago's securities away for free. The appellants do not point to any language in § 551.102(26) that supports their more restrictive reading, and, as stated, we must interpret § 551.102(26) liberally.

¶34 However, assuming that the value must inure to the person making the offer, we nevertheless reject the appellants' argument that the lack of compensation precludes the conclusion that an offer to sell was made here. First, although the appellants did not receive any compensation for their services, pursuant to the initial offer that they extended to Seago, they were to receive compensation: the hearing examiner found that, in offering to sell securities on Seago's behalf, "Leach and Cunningham informed Seago … that their fee would be a small percentage of each transaction just like any other broker would charge." As a result, notwithstanding that the appellants never received any compensation, their *offer* was nonetheless an offer to dispose of securities on Seago's behalf for compensation and therefore, even if the appellants are correct that "value" means "compensation," the appellants' offer was an "offer to sell."

¶35 Second, we agree with DFI that although the appellants did not receive compensation for their services, it is "value" and not "compensation" that must be received under the definition of "offer to sell," and here, the appellants received "value." The hearing examiner found that despite Leach and Cunningham's initial representation regarding what they would charge Seago, "PV Wealth did not collect a fee for providing financial services to Seago." The hearing examiner further found that "[t]his was a business decision of Cunningham and Leach. Through managing the investments of … Seago, they

17

expected PV Wealth to build a reputation as a successful financial advisor at which point they would start collecting fees." The appellants equate "value" with compensation, but "value" is defined more broadly as "[t]he significance, desirability, or utility of something." *Value*, BLACK'S LAW DICTIONARY (12th ed. 2024). The opportunity to build their business reputation is value that the appellants received in exchange for managing Seago's investment accounts.

¶36 In support of the appellants' argument that they did not make an "offer to sell" because they did not receive compensation, the appellants rely on ***Pinter v. Dahl***, 486 U.S. 622 (1988). In ***Pinter***, the U.S. Supreme Court addressed the circumstances under which a nonowner of securities may be liable as a "seller" of securities under the federal Securities Act of 1933 after soliciting a securities purchase. *Id.* at 646-47. In addressing this issue, the Court interpreted language from the Act that the Court quoted as stating, "'Any person who ... offers or sells a security' in violation of the registration requirement of the Securities Act 'shall be liable to the person purchasing such security from him.'" *Id.* at 641 (alteration in original) (quoting 15 U.S.C. § 77*l*); *see also id.* at 643 (quoting the relevant definition from 15 U.S.C. § 77b(3) of "offer to sell," "offer for sale," or "offer" as including "'every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.'"). In determining what constituted a "seller" to whom liability extended under the Act, the Court recognized that liability was not limited only to those who passed title. *Id.* at 646. For example, the Court recognized that "when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is … liable as a statutory seller." *Id.* Relevant here, the Court also stated that "Congress did not intend to impose … liability on a person who urges the purchase but whose motivation is solely to benefit the buyer," and that "liability extends only to the person who

successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647. The appellants rely on this language from *Pinter* to argue that they did not make an offer to "sell" securities because they were not motivated by their own financial interest or those of the securities' owner. We disagree.

¶37 As stated, the hearing examiner here found that the appellants told Seago that they would be honored to have her as PV Wealth's first client, and the appellants' decision not to charge Seago was "a business decision" that the appellants made in order "to build a reputation as a successful financial advisor at which point they would start collecting fees." These findings, which, as explained below, the appellants do not successfully challenge, support a conclusion that the appellants were "motivated at least in part by a desire to serve [their] own financial interests." *Id.*

¶38 Based on the foregoing, we reject the appellants' argument that DFI lacked jurisdiction under WIS. STAT. § 551.613 to bring this enforcement action.

## II. PV Wealth acted as a "broker-dealer," and Cunningham was PV Wealth's "agent."

¶39 The appellants argue that PV Wealth and Cunningham did not violate WIS. STAT. §§ 551.401 or 551.402 because PV Wealth is not a "broker-dealer" and Cunningham is thus not an "agent."[11] We disagree.

---

[11] Although the appellants raised this argument during the administrative proceedings before DFI, they did not raise this argument before the circuit court in their petition for judicial review. However, because DFI does not argue that the appellants forfeited this argument, we address it without considering whether it was forfeited.

¶40 The hearing examiner determined that PV Wealth transacted business in Wisconsin as an unregistered broker-dealer in violation of WIS. STAT. § 551.401 and that Cunningham transacted business in Wisconsin as an unregistered agent of PV Wealth in violation of WIS. STAT. § 551.402. *See* § 551.401(1) ("It is unlawful for a person to transact business in this state as a broker-dealer unless the person is registered under this chapter as a broker-dealer or is exempt from registration …."); § 551.402(1) ("It is unlawful for an individual to transact business in this state as an agent unless the individual is registered under this chapter as an agent or is exempt from registration as an agent …."). A "broker-dealer" is "a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account." WIS. STAT. § 551.102(4); *see also* § 551.102(20) (defining "person" as meaning, among other things, "a limited liability company"). An "agent" is "an individual … who represents a broker-dealer in effecting or attempting to effect purchases or sales of securities …." Sec. 551.102(2).

¶41 Applying WIS. STAT. § 551.102(4)'s definition of "broker-dealer" to the facts here, we conclude that PV Wealth acted as a broker-dealer. PV Wealth managed Seago's investment accounts for 29 months, during which time Cunningham routinely traded securities on Seago's behalf. Moreover, as previously stated, the hearing examiner found that

> Leach and Cunningham represented to Seago that they were starting their own business, PV Wealth, and that they would be honored to have Seago as their first client…. In addition, Leach and Cunningham informed Seago … that their fee would be a small percentage of each transaction just like any other broker would charge.

(Citations omitted.) The hearing examiner also found that, despite Leach's and Cunningham's initial representation regarding their fee,

> PV Wealth did not collect a fee for providing financial services to Seago …. This was a business decision of Cunningham and Leach. Through managing the investments of … Seago, they expected PV Wealth to build a reputation as a successful financial advisor at which point they would start collecting fees.

¶42 The record shows that for more than two years, PV Wealth routinely traded securities on Seago's behalf in the hopes of building a successful business reputation. For these reasons, PV Wealth was a "broker-dealer," and Cunningham its agent, because PV Wealth was "engaged in the business of effecting transactions in securities for the account of others." The appellants' arguments to the contrary are unpersuasive.

¶43 The appellants argue that PV Wealth is not a broker-dealer because a person must receive compensation to be "engaged in the business" of effecting securities transactions. We reject this argument for the reasons that follow.

¶44 To start, we disagree with the notion that one must receive compensation for services in order to be "engaged in the business" of providing those services. A business might choose not to seek compensation in exchange for services for various reasons—for example, to cultivate goodwill, to attract new clients, or as here, to build a reputation. The appellants' position is not supported by the text of WIS. STAT. § 551.102(4), and to adopt this position would contravene our duty to interpret WIS. STAT. ch. 551 liberally to accomplish its remedial purpose of protecting Wisconsin investors. *See McGuire*, 302 Wis. 2d 688, ¶12. As the North American Securities Administrators Association points out in its nonparty brief, requiring the registration of broker-dealers ensures that those who are engaged in the business of effecting securities transactions are qualified to do so and are subject to oversight. As the Association puts it, "To exclude individuals from the standard knowledge examinations and ethical requirements

because they are not established or experienced undermines the purpose of the registration framework."

¶45    Reading WIS. STAT. § 551.102(4) in context also undermines the appellants' interpretation.  *See Kalal*, 271 Wis. 2d 633, ¶46 ("Context is important to meaning.").  Elsewhere in WIS. STAT. ch. 551, "investment adviser" is defined as someone who provides services "for compensation."   Sec. 551.102(15) (defining "investment adviser" as "a person that, for compensation, engages in the business of advising others … as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities.").  The fact that § 551.102(4)'s definition of "broker-dealer" does not similarly explicitly require the receipt of compensation supports the view that the receipt of compensation is not necessary to be a broker-dealer.

¶46    The appellants argue that WIS. STAT. § 551.102(4)'s definition of "broker-dealer" should be interpreted as requiring the receipt of compensation so that it is consistent with § 551.102(15)'s definition of "investment adviser." However, "when the legislative body uses particular words in one subsection of a statute but not in another subsection, we conclude the legislative body specifically intended a different meaning." *Monroe Cnty. DHS v. Luis R.*, 2009 WI App 109, ¶42, 320 Wis. 2d 652, 770 N.W.2d 795.  Applying this canon of statutory interpretation, if the legislature had intended for § 551.102(4)'s definition of "broker-dealer" to be interpreted consistently with § 551.102(15)'s definition of "investment adviser," the legislature would presumably have used the same language.  For example, the legislature could have defined a "broker-dealer" as a person that, for compensation, effects transactions in securities for the account of others or for the person's own account.  That the legislature did not do so supports

an interpretation of "engaged in the business of" that does not require the receipt of compensation.

¶47 The appellants also argue that "[i]f compensation were not a required element" to be considered a "broker-dealer," it would lead to absurd results. More specifically, the appellants argue that, without this requirement, a parent trading on behalf of the parent's child would be a "broker-dealer" and thus subject to, for example, WIS. STAT. § 551.401's broker-dealer registration requirement. We disagree. Our conclusion that PV Wealth was a broker-dealer takes into consideration that Leach and Cunningham told Seago that they were starting a business, that they would be honored to have Seago as PV Wealth's first client, that they initially told Seago they would charge her a small percentage of each transaction, and that they subsequently made the business decision not to charge a fee in order to build a reputation as a successful business. As a result, PV Wealth's conduct is readily distinguishable from a parent trading on behalf of the parent's child, and our reasoning here does not support a reading of WIS. STAT. § 551.102(4) under which such a parent would be "engaged in the business" of effecting securities transactions.

¶48 The appellants also rely on federal case law to support their argument that PV Wealth is not a "broker-dealer" because PV Wealth did not receive compensation. The federal Securities Exchange Act defines the term "broker" using language that is the same as the relevant language from WIS. STAT. § 551.102(4)'s definition of "broker-dealer." *Compare* § 551.102(4) (defining "broker-dealer" as "a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account") *with* 15 U.S.C. § 78c(a)(4)(A) (defining a "broker" as "any person engaged in the business of effecting transactions in securities for the accounts of others"); *see*

*also* 15 U.S.C. § 78c(a)(5)(A) (defining a "dealer" as "any person engaged in the business of buying and selling securities … for such person's own account"). To determine whether a person is a "broker" under the Securities Exchange Act, federal courts use a fact-intensive, totality-of-the-circumstances analysis that takes into account an array of nonexclusive factors. *See, e.g.*, **S.E.C. v. Kramer**, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011); **United States Sec. & Exch. Comm'n v. Collyard**, 861 F.3d 760, 766 (8th Cir. 2017). As stated in **S.E.C. v. Hansen**, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984):

> Among the factors listed as relevant to a determination of whether an individual acted as a broker … are whether that person 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors.

*See also* **Kramer**, 778 F. Supp. 2d at 1334 (identifying the factors listed in **Hansen** as the most frequently cited for determining whether a person qualifies as a broker).

¶49 As an initial matter, we observe that although case law interpreting federal securities legislation is instructive, *see* **McGuire**, 302 Wis. 2d 688, ¶12, none of the federal case law that is cited by the parties and that uses this multi-factor, totality-of-the-circumstances analysis is binding on this court, *see* **State v. Mechtel**, 176 Wis. 2d 87, 94, 499 N.W.2d 662 (1993). Therefore, we are not required to use this factor-based analysis from federal case law. Further, it strikes us as more straightforward, even in the absence of Wisconsin case law interpreting WIS. STAT. § 551.102(4)'s definition of "broker-dealer," to simply apply the language of § 551.102(4) to the facts here. *Cf.* **United States Sec. & Exch.**

*Comm'n v. Murphy*, 50 F.4th 832, 843-46 (9th Cir. 2022) (relying on the statutory text of 15 U.S.C. § 78c(a)(4)(A)'s definition of "broker" rather than on the *Hansen* factors, stating that "the [statutory text] itself provides considerable guidance on its own," and describing the *Hansen* factors as "simply a judicial effort to provide meaning to the statutory text" and as "more directly applicable" in some cases than in others). As stated above, applying the language of § 551.102(4) to the facts before us, we conclude that PV Wealth is a broker-dealer.

¶50    In any event, we disagree with the appellants' argument that, under the analysis used in federal case law, the receipt of compensation is necessary to be a "broker." First, although the appellants argue generally that compensation is required to be a "broker-dealer," the only federal case law that they provide in support of this argument refers to transaction-based compensation, in particular. Specifically, the appellants have found one federal case that states, "Transaction-based compensation, or commissions[,] are one of the hallmarks of being a broker-dealer." *See Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006). To be sure, "some factors (i.e., those factors typically associated with broker activity) appear more indicative of broker conduct than others." *Kramer*, 778 F. Supp. 2d at 1334. However, no one factor is dispositive. *Id.*

¶51    Additionally, to say that transaction-based compensation is a "hallmark" of being a broker-dealer is not the same as saying that such compensation is necessary to be deemed a broker-dealer. We observe that broker-dealers, instead of receiving transaction-based compensation or commissions, may also be compensated in relation to the amount of assets that they manage for a client. For example, the appellants quote DFI's website, which states, "Compensation is normally in the form of commission but some firms charge one

fee for all services, based on the value of the assets in the account." *See* State of Wis., Dep't of Fin. Inst., *Broker-Dealer*, https://dfi.wi.gov/Pages/Securities/ RegistrationOfProfessionals/BrokerDealer.aspx (last visited Nov. 20, 2024).

¶52    Further, even if we assume, as the appellants argue, that transaction-based compensation is a "hallmark" of a broker-dealer, here the fact that PV Wealth did not receive transaction-based compensation does not reflect that PV Wealth was not engaged in activities traditionally associated with broker-dealers. *See id.* at 1334 (stating that the factors to be given the most weight are "those factors typically associated with broker activity"); *see also Hansen*, 1984 WL 2413, at *10, (listing as a factor whether a person "received commissions *as opposed to a salary*" (emphasis added)).  Indeed, as stated, the hearing examiner found that "Leach and Cunningham informed Seago … that their fee would be a small percentage of each transaction *just like any other broker would charge*," but that they made a "business decision" not to seek this transaction-based compensation in order "to build a reputation as a successful financial advisor at which point they would start collecting fees."  (Emphasis added.)  Given these facts, it would not make sense to give controlling weight to the fact that PV Wealth decided not to request transaction-based compensation, despite their initial representations to the contrary.

¶53    The appellants also argue that, under federal case law, only one of the factors listed in *Hansen* applies to PV Wealth—namely, that PV Wealth provided Seago with investment advice.  *See Hansen*, 1984 WL 2413, at *10. Even assuming that only one of the factors listed in *Hansen* is met, this does not undermine our confidence in our conclusion that PV Wealth was a "broker-dealer" for a number of reasons.

¶54  First, as noted above, the ***Hansen*** factors are a judicial effort to clarify the meaning of the statutory text, and they are more instructive in some cases than in others. ***Murphy***, 50 F.4th at 843-46; *see also* ***United States S.E.C. v. Benger***, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010) (acknowledging, on a motion to dismiss, that if the court were to rely exclusively on the factors listed in ***Hansen***, the Securities and Exchange Commission ("SEC") might not have sufficiently alleged that the defendant was a broker, but nonetheless concluding that the SEC had sufficiently alleged that the defendant was "effecting transactions in securities for the account of others").

¶55  Second, the factors listed in ***Hansen*** are nonexclusive, *see* ***Kramer***, 778 F. Supp. 2d at 1334, and federal courts have subsequently identified additional factors. In particular, courts have stated that regularity of participation in securities transactions is the most important factor in determining whether a person is a broker. *See, e.g.*, ***S.E.C. v. Kenton Cap., Ltd.***, 69 F. Supp. 2d 1, 12 (D.D.C. 1998). Here, the record shows, and the appellants do not dispute, that PV Wealth managed Seago's investment accounts for more than 29 months, and that during this time Cunningham regularly traded securities on behalf of Seago.[12] Because the ***Hansen*** factors are nonexclusive, because PV Wealth regularly traded securities on Seago's behalf, and because a straightforward application of WIS. STAT. § 551.102(4) compels the conclusion that PV Wealth was a "broker-dealer" and Cunningham its agent, the appellants' argument relying on ***Hansen*** is unavailing.

---

[12] For example, at the hearing, an advanced securities examiner from DFI testified that Cunningham was engaged in day-trading throughout these 29 months, and Seago similarly testified at a deposition that Cunningham was trading on a daily basis.

### III. The hearing examiner's finding that Seago was a client of PV Wealth is supported by substantial evidence.

¶56    The hearing examiner found that "Leach and Cunningham represented to Seago that they were starting their own business, PV Wealth, and that they would be honored to have Seago as their first client."  The appellants argue that this finding constitutes a finding that Seago was a client of PV Wealth and that the finding that Seago was a client "is central to every violation alleged in this case" and is "the backbone of the [hearing examiner's] ultimate legal conclusions."  The appellants further argue that because this finding is not supported by substantial evidence, DFI's decision must be set aside.

¶57    We first observe that the appellants do not explain why the hearing examiner's conclusion that the appellants engaged in the violations alleged depends upon a finding that Seago was a client of PV Wealth.  Although the appellants repeatedly put quotation marks around the word "client," "client" is not a term that is defined in WIS. STAT. ch. 551, *see* WIS. STAT. § 551.102, nor is it used in any of the relevant statutes, *see* WIS. STAT. §§ 551.401, 551.402, and 551.501, and the appellants do not otherwise tether their argument to the language of the statutes that the appellants violated.  Regardless, we conclude that the hearing examiner's findings of fact on this topic are supported by substantial evidence.

¶58    As noted, the only finding of fact that the appellants specifically purport to rely on is the hearing examiner's finding that "Leach and Cunningham represented to Seago that they were starting their own business, PV Wealth, and that they would be honored to have Seago as their first client."  We observe that this is not necessarily the same as a finding that Seago was a client of PV Wealth.  However, the hearing examiner also found that "Seago agreed to invest her money

with PV Wealth" and that Seago "understood that by retaining PV Wealth, she would be receiving professional investment management of her assets." Assuming without deciding that these explicit findings can be construed as implicitly finding that Seago was a client of PV Wealth, this implicit finding, as well as the explicit findings that underlie it, are supported by substantial evidence.

¶59 The hearing examiner relied on Seago's trial testimony to support these findings. At trial, Seago testified to the following. She had a Skype meeting with Leach and Cunningham, at which they offered to invest and manage her worker's compensation settlement and her retirement funds. At that meeting, Leach told her that he and Cunningham "were starting their own business, and they would be honored to have [Seago] as their first client." Seago understood that "if [she] retained PV Wealth Advisors, [she was] going to get professional investment management of [her] assets[.]"

¶60 Seago also testified as follows:

Q Did either Mr. Cunningham or Dr. Leach tell you that in order to become a client of PV Wealth Advisors you had to sign a written agreement?

A They said I had to sign all these papers that they had sent to me in order for them to begin trading, working for me.

Q If they had presented you with a PV Wealth Advisors agreement formalizing your relationship with PV Wealth Advisors, would you have signed it?

A Yes. I thought I did because a lot of the stuff had PV Wealth Advisors on it ….

….

Q Would you have allowed Dr. Leach and Mr. Cunningham to manage your investments if they had not told you they were starting a business of PV Wealth Advisors?

A   No.

¶61   In addition to Seago's hearing testimony, the attorney who represented Seago in connection with her worker's compensation claim, Ron Fitzpatrick, testified that he understood Seago to be a client of PV Wealth based on his communications with Leach and Cunningham.  These communications included a proposed investment plan that Leach emailed to Fitzpatrick, which was written on PV Wealth letterhead and stated "Private Client Services" at the top of the page.  Additionally, when Cunningham received Seago's settlement check for her worker's compensation claim, he endorsed it as: "PV Wealth Advisors – Daniel Cunningham for Deposit Only – Charles Schwab & Co."  Further, a California investor, Ann Moore, testified that she and her husband met with Cunningham and Leach and agreed to become clients of PV Wealth.  Moore testified that during the meeting, Cunningham and Leach stated that they would not collect any fees because Moore and her husband were some of their first clients:

> [B]ecause they were just starting out, they said … they mentioned how in other [brokerage] houses … you'd get charged for every trade when you buy or when you sell. And they were going to waive that fee because we were starting at the ground floor with them and … when we started making money they would -- then they would be making money.
>
> So … at this point they were … waiving any fees for us -- for them to manage our money.

¶62   All of this is substantial evidence that supports the finding that Seago was a client of PV Wealth.

¶63   The appellants direct us to evidence in the record that might weigh against a finding that Seago was a client of PV Wealth.  For example, there was evidence that there was no client contract or fee agreement between Seago and PV

30

Wealth and that Seago never paid PV Wealth. The appellants also emphasize the fact that Seago signed limited powers of attorney that named Cunningham, personally, as Seago's agent, rather than PV Wealth, and which stated that Cunningham was self-employed at his tutoring business, PV Test Prep. Further, the appellants point out that Seago, at the appellants' direction, called Charles Schwab and told the representative that Cunningham was a family member in order to convince Charles Schwab to increase Cunningham's trading privileges for Seago's accounts, which the appellants argue Seago could not have done while also understanding that she was a "client of a professional investment advisory firm." However, such evidence does not alter our conclusion as to the hearing examiner's findings. Importantly, we uphold an agency's findings of fact unless a reasonable mind could not reach the conclusion that the agency reached, and we defer to the agency as to issues of credibility and the weight of the evidence. *See Town of Holland v. PSC*, 2018 WI App 38, ¶22, 382 Wis. 2d 799, 913 N.W.2d 914. Given this deferential standard of review and the substantial evidence in the record that supports the finding that Seago was PV Wealth's client, we reject the appellants' arguments on this issue.

## CONCLUSION

¶64    For the reasons stated, we affirm.

*By the Court.*—Order affirmed.

Recommended for publication in the official reports.

31